## Pennsylvania Railroad Company *versus* Ogier.

Though the facts of a case may so clearly prove negligence, as to render it the duty of the court to pronounce upon them as matter of law; yet, in cases of controverted facts, the existence or non-existence of which may fairly be presumed to affect the mind in a given exigency, the question of the character of the acts, whether negligent or otherwise, is necessarily for the jury.

Negligence consists in the absence of that ordinary care which a party ought to observe under the particular circumstances in which he is placed. A different degree of care is required, where there is reason to apprehend danger, from that which is necessary where none is to be expected.

A defendant cannot impute a want of vigilance to one injured by his act, as negligence, if that very want of vigilance were the consequence of an omission of duty on the part of the defendant.

It is not error, in an action by a widow to recover damages for an injury resulting in the death of her husband, for the court, after giving a correct instruction to the jury as to the measure of damages, to add, "much is left, and much must always be left, to your sound discretion." It must be intended, that this discretion is to be exercised, within the limitation previously prescribed to them by the court.

ERROR to the Common Pleas of *Chester county*.

This was an action on the case by Catharine G. Ogier, the widow of Dr. Septimus A. Ogier, against the Pennsylvania Railroad Company, to recover damages for the negligence of the defendant, which resulted in the death of the plaintiff's husband.

The facts of the case are fully stated in the following charge to the jury, which was delivered in the court below :—

"At or about the hour of four o'clock in the afternoon of the 26th day of November 1857 (a few days less than two years ago), Septimus A. Ogier, a practising physician of that neighbourhood, went down the Tun road northward, toward the Pennsylvania Railroad. At a break in the hill-side, down which he was travelling, he made a halt, and listening, to ascertain whether any train of cars was near, he said to his companion, 'All's right,' and drove onward. While crossing the railroad where the Tun road intersects the same, his horse and wagon were struck by the locomotive, drawing a train of cars on the Pennsylvania Railroad, and the horse was torn to pieces, the wagon broken, and the doctor was killed. His widow, Catharine G. Ogier, brings this suit against the Pennsylvania Railroad Company, to recover damages for the injury she sustained in the death of her husband, and it is this suit you are sworn and affirmed to try. These are the great main outlines of the case, and a reference to the minute but not less important parts of the evidence will be made hereafter.

"The plaintiff declares, that on the day aforesaid the said

[Pennsylvania Railroad Company v. Ogier.]

Septimus A. Ogier was lawfully passing along the said highway, with his horse and carriage, at a point where the said public and common highway, and the railroad of the said Pennsylvania Railroad Company, cross and intersect each other; and that the said company, by its engineers, conductors, and servants, so negligently, carelessly, and improperly drove, governed, and directed the locomotive engine and cars, that by and through the said negligence, carelessness, and impropriety, the said locomotive engine and cars struck with violence the carriage in which Dr. Ogier was riding and passing, crushing and destroying the same, and bruising and wounding the said Dr. Ogier, by reason whereof the said Septimus A. Ogier then and there died. It further states, that the said Dr. Ogier was the husband of the said Catharine, the plaintiff in this suit, was a graduate of medicine, and a practitioner of medicine and surgery; that his practice and profession were of great value; and that by reason of the death of the said Dr. Ogier, caused and occasioned as aforesaid, she, the said Catharine, is deprived of her usual means of support and subsistence, and is greatly prejudiced in her pecuniary means and resources.

"This declaration, of which the foregoing is a brief abstract, sets out in terms clear and explicit, as the cause of death, the carelessness and negligence of the defendants, and the consequent pecuniary loss which she has suffered, by reason of that death depriving her of her usual means of support and subsistence. It furnishes you also, in the manner here stated, with a concise and plain view of the questions you are called on to determine. Other questions, indeed, growing out of these primary considerations, will address themselves to your calm judgments, and to which your attention will be directed; but they belong rather to the defence set up than to the substantive cause of action alleged in the declaration, and will be noticed by me at the proper time.

"First, then, was the death of Septimus A. Ogier occasioned by the negligence, carelessness, and impropriety of the Pennsylvania Railroad Company? That he was killed in the manner here mentioned, there can be no denial or doubt. The Pennsylvania Railroad Company, on the day herein designated, were running their engine and cars on their own road, on the proper track of the said road, and at or about the usual time of day. They had the right, beyond all question, to use their road, with their engine and cars, their engineers, conductors, and servants, to carry passengers or freight, as they should deem right, subject only to the legal principles which govern and control the exercise of such rights. Dr. Ogier, with his horse and wagon, on the same day and time, was travelling on a common highway, used and occupied indiscriminately by every person whose business or pleasure called him along it. He, too, had the unquestioned right to use this highway for his own purposes, and at such times as suited his

[Pennsylvania Railroad Company *v.* Ogier.]

pleasure or convenience, subject at the same time to the undoubted rights of others. The company, with their engine and cars, and the doctor, with his horse and carriage, had their respective rights at the crossing of the Tun road, of such character that they should not molest or interfere the one with the other. These reciprocal rights created corresponding duties. The railroad company, notwithstanding their right to travel along and over their own road, were bound to exercise due care and diligence in the use thereof, and Dr. Ogier, although on a road whereon he had the right to travel, was also under the obligation of duty so to exercise his right as not to interfere with the rights of others.

"With these rights and duties respectively they met at the crossing, and the fatal accident, of which we have heard from the evidence, occurred. The doctor was on the track of the railroad, and the engine and train passed along, breaking up the vehicle wherein he was riding, and killing him. Where was the negligence which occasioned this fatal collision? If it were with. the railroad,— the engineers, conductors, or servants controlling the train—the defendants are liable. If the negligence were on the part of deceased, no action can be sustained. Or if there were mutual negligence—if they were both negligent, and the collision occurred for the want of proper care and prudence on the part of both, the action cannot be sustained. These principles are declared to be law. by the Supreme Court of this state, and should govern courts and juries in the determination of such cases.

"Wherever there is a collision, according to the decision in 6 *Casey* 242, there is culpable negligence somewhere, for, says the learned judge, where both parties practise a reasonable measure of diligence, collisions are impossible. Negligence has been described as the want of that care which men of common sense and common prudence ordinarily exercise in like employments. It appears to me, that the foregoing is a fair and plain definition of negligence, and it is highly important that the jury should carry it with them in their examination of the testimony. To determine whether the defendants were negligent at the time of the accident, a brief view of the evidence is necessary.

"The railroad, immediately before reaching the crossing from the east, is traversed by a high embankment or bluff, running along the south side of the road, which prevents a view to the eastward, along the railroad from the Tun road. A traveller, approaching the railroad from the south, cannot see a train of cars coming from the east until he is within a few feet, say eighteen feet, of the south track. On the Tun road, approaching the crossing from the south, the hill has a down grade of about seven degrees, while on the railroad the down grade from the east is about twenty-three feet to the mile. As it is impossible for the traveller on the Tun road to see the locomotive and cars, as they approach the cross-

ing from the east, so also is it impossible for the engineer of the train to observe the traveller on the Tun road, as he approaches the crossing from the south. The view across the angle is wholly intercepted. On the face of the hill, coming down to the railroad from the south, and at the distance of eighty-four feet from the south rail of the south track, there is a break in the hill, where travellers approaching the railroad usually stop their wagons or carriages, and listen for the whistle of the engine and the rattling of the cars. This place is as near to the railroad, according to the opinion of witnesses, as one can safely go, at the passing of the train. Along the Tun road, and down the hill from the south, Dr. Ogier, with a companion, was passing, when, coming to the break in the hill, he halted for a short space of time, 'a good little bit,' says the witness, 'long enough to satisfy us that no train was coming—we heard no whistle at all, when the doctor said, it's all right, and went on.' He was then, as I have stated, eighty-four feet from the railroad. He went on at a slow trot, and met the engine and train on the north track, and was almost instantly killed. The train of cars was running, as was testified to, at the usual speed of twenty-five miles to the hour. Some testimony has been given as to the condition of the crossing upon the Tun road, but from the view I take of the case, and as it was somewhat contradictory, I shall take no special notice of it, further than to say that the jury can, if they deem it of any weight, take it into consideration in connection with the question of negligence. Other matters, connected with the case, may be overlooked by me, and if so the jury, I presume, will apply them properly.

"Was the whistle sounded as the crossing signal? If sounded at all, the testimony leads us to the conclusion that it was blown at a point a short distance east of where the whistling-post now stands, or something more than 1500 feet from the crossing. At that time there was no whistling-post on the road, at least at this place, and the point which governed the engineer in sounding his alarm signal, was the first view of the gable-end of a house on the north side of the track on the Tun road. The evidence upon this point is very contradictory. On the side of the defendants, we have William Wolf, the engineer, Henry Stormfeldt, the fire- man, Rudolph Delany, the baggage-master, who were on the train on that occasion, and who swear positively that the signal-whistle for that crossing was sounded, at the proper time and place, on that day. On the other hand, many witnesses were called, who seem to have had opportunities of hearing almost equal to those in charge of the train, who testify that they heard no whistle as a signal for the crossing from the train on that day. Among these are Miss Buffington, who, as she states, was at the window, watching for the train,—Mrs. Hibberd and her hired girl, living to the north of the railroad some 200 yards, who were at the win-

[Pennsylvania Railroad Company *v.* Ogier.]

dow looking at the train as it passed along, at the point where it is alleged the whistle was given—the coloured man, chopping wood near the place where it must have been sounded, if at all— Mrs. Goven, living also near the same point—Mr. Fetters, on his way from school, and in sight of the railroad—Mr. Evans, who was on board the train. Besides these, there were the conductor of the train, Mr. Unger, and all those of the neighbourhood who have been called as witnesses, who testify, some of them that no whistle was sounded on approaching the crossing, and all that none was heard by them as an alarm-whistle. All, or nearly all of these witnesses heard the whistle for down break at the crossing, but none of them heard the alarm-whistle above. I am not about to go into an examination of the evidence upon this point, further than I have already stated, except to say that, if I have overlooked any part thereof, you will doubtless remember it, and give it the proper weight. As a general rule, affirmative evidence is more reliable than negative, but in the case before you, it would seem, that some who speak negatively had full opportunities of seeing and hearing, equal to any of those who speak affirmatively on the point. It is your duty to examine and weigh this testimony in relation to the question of negligence, and should you conclude that no alarm-signal was given before reaching the crossing, I presume you will have no difficulty in coming to the determination, that the omission to sound the signal-whistle was culpable negligence on the part of the company. Hence I affirm the fifth point of the plaintiff, that ' it is the duty of the defendant's servants to give a signal of the approach of a train to a road crossing, at such time and in such manner as to be a timely and sufficient warning to passengers upon the road; and there is evidence that no such signal was given.' With regard to the evidence on this point, I have already alluded to it in a way which renders further comment unnecessary, and it is for the jury to say, whether such signal was given or not.

" This embraces all which I deem important to notice in this connection, except to refer to the third and fourth points furnished me by the defendants, in these words :—' If the customary signal was given by the engineer at the proper time and place, in approaching the place where the accident occurred, there was no negligence on the part of the agents of the defendants, and the plaintiff cannot recover.' ' There is positive evidence for the consideration of the jury, that the customary signal was given by the engineer on that occasion, at the proper time and place.' The last of these propositions may be affirmed, and I here affirm it; but the jury will remember what has been stated in relation to that evidence. There is evidence on both sides, affirming and denying the fact that a signal was given, as here spoken of, and I leave to the jury to say whether a signal was given or not. I

[Pennsylvania Railroad Company *v.* Ogier.]

am not prepared to affirm the first-mentioned proposition in terms. On the contrary, the 6th point made by the plaintiff, ' that negligence in approaching a crossing does not consist merely in an omission to give the customary signal, but exists also when the rate of speed is imprudent and unreasonable; and in considering what speed is prudent and reasonable, the condition and character of the crossing may properly be taken into the account,' is a legal proposition, and is affirmed. In examining this branch of the case, the jury will take into consideration all the evidence in relation to the crossing—the situation of the two roads, and the rate of speed at which the train approached the crossing, and will say whether, under all the circumstances, the defendants exercised, on the occasion referred to, such care as men of common sense and common prudence ordinarily exercise in like employments. With this addition to the defendant's point, the proposition with regard to the signal is correct. No man can look upon that crossing as detailed by the evidence, without being struck at once with the danger of the collision, unless care and prudence should be observed by trains as well as travellers.

" Should the jury come to the conclusion, upon a candid consideration of the whole case, recollecting what constitutes negligence as previously stated from sound authority, that the railroad company was guilty of no negligence on the occasion referred to, it will be your duty to find a verdict for the defendant. But should you, on the contrary, be deliberately of the opinion, from the same sources of information, that the railroad company were guilty of negligence, another question will arise from the principles here affirmed, to wit, whether the deceased was also guilty—in other words, whether there was mutual negligence. I have already said, that if the collision and consequent death occurred, from the want of proper care and prudence of both parties, this action cannot be sustained. It becomes a question, therefore, whether Dr. Ogier, at the time of the accident, acted as men of common sense and common prudence ordinarily act in like cases. To determine this question, you will turn again to the testimony of the witnesses, and will consult it in relation to the conduct of Dr. Ogier, and the condition of things at the crossing and along the two roads. The danger of the crossing applies with equal force to the traveller upon the Tun road as to the trains on the railroad, and if in one case it should require due and exact care, so in the other also. The doctor stopped at the break on the face of the hill, and listening for the train and whistle, and not hearing the alarm signal, nor the noise of the train, went on at a slow trot till he got his vehicle on the track and was struck by the engine and killed. His view of the railroad was obstructed by the bluff to the east of the road, until he came past a shanty which stood

at the west end of the bluff, at the distance of about eighteen feet from the south side of the railroad. From the point here mentioned, eighteen feet south of the railroad, a traveller may see along the railroad to the east, a distance of 352 feet. The ground on the Tun road, according to the testimony of one witness who went to the place to make the examination, 'is pretty steep for twenty or thirty feet from the break, and then is tolerably level all the way to the crossing, so that a man driving gently could stop in time to avoid a collision.' The witness goes on to say— that 'a person coming within ten feet of the railroad might stop, but his horse would be on the south track; at that point, ten feet south of south track, a traveller could see eastward 623 feet. I would rather stop at the break, let my horse be ever so quiet—I would not think it prudent to drive further or go nearer; I would not have so much confidence in my horse as to go to the railroad.' The jury having been upon the ground, I do not deem it necessary to be more minute on this point. It is perhaps enough for the purpose of the inquiry, that on that level, at ten feet from the south rail of the railroad, a traveller can see eastward along the railroad the distance I have stated. One can gather fairly from the testimony that the doctor did not stop from the time he left the break until he was struck by the engine. Miss Buffington, whose testimony on another point we have already noticed, says : 'I saw the train, and observed, there is the train, and there is a man going to drive into it, and immediately they were smashed up.' So also the fireman on the engine testifies : 'I was looking out on the left side of the engine, as we approached the Tun road—I was looking out for a flag at the station, and to see whether the crossing was clear—I saw the crossing was clear, and there was no flag, when I came round the last curve; as I came round the last curve my eyes commanded the whole road; at that time the track was clear, and no vehicle was in sight. I kept my eye on the crossing, and looked further ahead on the track after I found the crossing was clear; and when I brought my eye back, the horse was on the track, and we in the act of striking him.' Taking all the circumstances into consideration, you will say whether the doctor should have stopped on the level near the railroad or not— whether he could or could not have avoided the accident by proper care and diligence—whether, had he exercised such care, as men of common sense and common prudence ordinarily exercise in like employments, he would or would not have avoided the fatal result. Did Dr. Ogier look? Ought he to have looked, when he could have seen 352 feet eastward? Did he look, or ought he to have looked, when going a little further he could have seen 623 feet eastward? We are examining this question now as though the whistle had not been sounded, and the railroad com-

pany had been negligent of their duties.   We are examining the other branch of the case, whether there was mutual negligence— in other words, whether Dr. Ogier exercised proper care at the time of the accident.   It is undoubtedly true, as stated in the 5th point of the defendant, that if the negligence of Dr. Ogier in the slightest degree contributed to the injury which caused his death, the plaintiff cannot recover, even if the agents of the defendants were also guilty of negligence.   There are three other points on this subject furnished to me by the defendants' counsel, which I may as well notice in this place.

" 1st.  ' If Dr. Ogier, as he approached the railroad, before his horse reached the north track thereof, could have seen the train approaching at the distance of 600 feet, it was his duty to stop until the train passed, and not endanger his own life, as well as the lives of the passengers on the train, by attempting to cross the track in advance of the train.'

" 2d.  ' The evidence is clear and uncontradicted, that Dr. Ogier could have seen the train approaching before he reached the track in time for him to stop his horse and avoid the collision.'

" 3d.  ' The evidence upon this point is conclusive proof of negligence on the part of Dr. Ogier ; is binding upon the jury.; and precludes a recovery in this action.'

" *These propositions, if affirmed as they stand, would take from the jury what it is your province to determine.*   I am not clear, from the evidence, as to the exact condition of things at the instant before the collision.   To measure the distances by time, it would seem that the train when first seen, or when it first could be seen, was but seventeen seconds from the centre of the Tun road, although the actual distance, according to one witness, was 634 feet.   It was the undoubted duty, according to my apprehension, of Dr. Ogier, as he approached the railroad, to look along the track, notwithstanding he had satisfied himself at the break on the hill that no train was approaching.   If, in looking eastward, he saw the train approaching, at a time and under circumstances which enabled him to stop his horse, he should have done so, and it was negligence not to do it.   If he really attempted to cross the track in advance of the train, after having seen it approaching, it was negligence in him—it was a want of proper care and prudence, and the plaintiff cannot sustain her action.   *I will not take the facts from you.  How the doctor got on to the north track, whether from the fright of the animal he was driving, whether from want of instant decision how to act, or in the deliberate attempt to pass before the train, is not and cannot be known.  From the position in which he was placed, when he first could have seen the approach of the train, it is a reasonable conclusion to draw, that he was in peril, and must have acted upon impulse rather than judgment. I would not call an error in the mode of relieving himself from*

*danger, either negligence or want of care. Under the circumstances attending the collision, I should not be willing to judge of the conduct of the doctor, by the ordinary rules which govern the actions of men.* All, therefore, which I can say upon these propositions is, that from the evidence, it seems clear the doctor could have seen the train at the distance of 600 feet before he reached the north track, and that if he deliberately attempted to pass before it, and in doing so was killed, there was negligence on his part, which must destroy the right of action. In examining this part of the case, *you will draw your conclusions, as reasonable men, from all the circumstances which surrounded Dr. Ogier, and regarding the rule of common sense and common prudence, will say whether or not there was negligence on his part.* If there were, this action cannot be sustained. I am requested by the plaintiff to say to you, that, '*if after having used ordinary care, such as prudent men generally do in passing over the railroad at the crossing, Dr. Ogier was placed in a state of peril, by the negligence of those having charge of the train, the defendants are responsible for the consequences which ensued, though the jury may believe that the peril may have been increased by an effort made to avoid it, or that it might have been lessened or escaped by the exercise of unusual courage and self-possession and instant resort to the proper expedient.*' This is affirmed, for the foregoing reasons, and the jury will judge from the testimony of the weight which it applies to the point at issue.

" Should you determine that the death of Septimus A. Ogier was occasioned by the negligence, carelessness, and impropriety of the Pennsylvania Railroad Company, and that the doctor did not contribute in the slightest degree, by his carelessness and negligence, to that event, the action being therefore sustained, your next inquiry will be the subject of damages. On this subject I shall have but little to say to you. After considerable doubt as to the measure of damages which should be awarded to the injured party, the principle seems now by recent decisions to be fixed and settled, that it is the loss occasioned by the death, in a pecuniary sense, that should govern a jury in their estimate of damage. Nothing is given for grief, for mental sufferings, for lacerated feelings, or disappointed hopes, because these cannot be measured by any amount of money.

" On this subject I have furnished to me, by the plaintiff's counsel, certain points which I will briefly notice. 1st. 'Whether the damages should be compensatory, or whether, in view of all the facts, they should be more than merely compensatory, and should assume the character of exemplary, is a question solely for the consideration of the jury. If the jury believe that the defendant's train approached to and arrived at a dangerous crossing, at a high, unusual, and unreasonable rate of speed; that the engineer

[Pennsylvania Railroad Company *v.* Ogier.]

failed to give the required and customary signal; that the crossing was in a bad condition for the transit of vehicles, and had been so for days and weeks, and that the death of Dr. Ogier was caused by the defendant's negligence, after the exercise of ordinary care and prudence on his part, it is for the jury to say whether such negligence was gross and wanton, and, if they find it to have been, they may render a verdict for exemplary damages.'

"I have no doubt that cases might occur where exemplary, or more than merely compensatory damages, might properly be given; as where the conduct of a defendant has exhibited oppression, fraud, wantonness, or other circumstances to call for exemplary damages; but I cannot see in the case before us any such production of facts. The jury are the judges of the damages, subject to the rules of law and the evidence of the case. The point is a synopsis of the plaintiff's cause of action and evidence, and throws out of view the testimony of the defendant. There is no evidence that the train was running at an unusual speed. The crossing and its condition has been spoken of by the witnesses, and, to my mind, the jury would disregard the evidence to arrive at the conclusion that it was in a bad condition. On the contrary, I would prefer to say, that if the plaintiff is entitled to recover at all, the damages should be compensatory merely, there being no evidence of any intentional wrong on the part of agents of the company, nor, to my mind, a reckless disregard to the safety of travellers crossing the railroad on a public highway. I have no doubt that a reckless disregard to the safety of others would furnish the jury with sound reasons for exemplary damages, even where no intentional wrong was committed. But while the jury should conform to the just principles of the law on the one hand, they should also be careful not to distort the testimony to meet propositions for exemplary damages. The measure of the damages in this case, as I have already stated, should be what the plaintiff has lost, in a pecuniary point of view, by the death of her husband, namely, a reasonable support and subsistence for herself, in the manner in which she was accustomed to live with her husband; and such sum only as will secure such support and maintenance should be allowed. In estimating the amount for such support and maintenance, the jury are permitted to go beyond the sum which would yield a scanty supply to her support; but while making the estimate of the value of the life of the deceased, which you have the right to do, and the consequent damage which the plaintiff has suffered by death, *much is left, and much must always be left, to your sound discretion.* In these observations I have answered, I believe, all the propositions which have been furnished to me, with perhaps the single exception of a verbal point, not reduced to writing, in regard to an estimate of damages

on account of the children. I do not admit that in this action the children can be taken into the account. The action is brought by the widow—it is her loss that is to be compensated, and whatever she shall recover will go into her pocket for her support and maintenance.

" Gentlemen, I have endeavoured, as far as I have been able in the hurry of a cause, to lay down for your guidance the principles of law which govern cases of this nature. I repeat, the measure of damages is the pecuniary loss which the widow has sustained by the death of her husband, and, in ascertaining such loss, you have a right to consider the condition in life of the widow, the manner in which she lived during the life of the husband, the means wherewith he supported himself and family, and the profits of his profession; and I would again say, that while the rule for the measure of damages is settled, the law acknowledges that *much must be left to your discretion.* A sound discretion, a just discretion—not such fanciful discretion as would attempt to remunerate the lacerated feelings of the living—this can never be reached—but a fair and reasonable discretion based upon the law and evidence."

To this charge the defendant excepted; and a verdict and judgment having having been rendered for the plaintiff for $10,250, the defendant removed the cause to this court, and here assigned for error those parts of the foregoing charge, which are printed in *italics.*

*W. Darlington, Cuyler,* and *Bell,* for the plaintiff in error.— The principal question is, was there negligence on the part of Dr. Ogier, which contributed to the injury? And upon this point, there is no conflict of evidence. The question of negligence was, therefore, one of law for the court; there was nothing to submit to the jury: Spencer *v.* Railroad, 5 *Barb.* 338; Haring *v.* Railroad, 13 *Id.* 9; Darcomb *v.* Railroad, 27 *Id.* 227; Mackey *v.* Railroad, *Id.* 528; Brook *v.* Railroad, *Id.* 532; Reeves *v.* Railroad, 6 *Casey* 464; O'Brien *v.* Railroad, 6 *Am. L. R.* 361

Undoubtedly, "much is left to the sound discretion of the jury," on the subject of damages; but the court should content themselves with laying down the proper rule, and telling the jury to regard it. After doing so, to say much is left to their sound discretion, is to tell them to do as they please.

*J. J. Lewis* and *J. P. Wilson,* for the defendant in error.— The case exhibits here a different aspect from what it did in the court below. There the main question was, whether a signal was sounded by the defendant's train, on its approach to the crossing of the Tun road. The verdict has found that no signal was sounded, and that fact is here to be considered as established.

The rights and duties of parties grow out of the circumstances

in which they are placed: Pennsylvania Railroad Company v. Kilgore, 8 *Casey* 296. Negligence is the want of the care and caution which is usually observed, by a person of ordinary prudence, in similar circumstances: Reeves v. Railroad Company, 6 *Casey* 461; Myers v. Snyder, *Brightly* 489; Beatty v. Gilmore, 4 *Harris* 466. A person is not chargeable with neglect of his own safety, when he exposes himself to one danger, by trying to avoid another: Pennsylvania Railroad Company v. Aspell, 11 *Harris* 150; Erie v. Schwingle, 10 *Id.* 389.

The charge of the court on the measure of damages is taken from the opinion of this court in the Pennsylvania Railroad Company v. Zebe, 9 *Casey* 330, where it is said that "in making the estimate of the value of life, and the consequent damage by death, much is still left to the sound discretion of the jury."

The opinion of the court was delivered by

THOMPSON, J.—There may, undoubtedly, be cases in which the only facts proven may present so clearly and incontestably features of negligence in regard to the specific ground of complaint, that it may become the duty of the court to pronounce it such as a matter of law. Such, for instance, as the rapid running of a train of cars around curves, at crossing places, over the railroad, without notice of any kind: Reeves v. The Delaware, Lackawanna and Western Railroad Company, 6 *Casey* 454. So in the exit of a passenger from the cars on an opposite side from that of the platform provided for his safe and convenient egress, under no controlling necessity for doing so: The Pennsylvania Railroad Company v. Zebe and wife, 9 *Casey* 318, and many other cases that might be imagined. But in cases of controverted facts, the existence or non-existence of which may fairly be presumed to affect the mind, in a given exigency, there the question of the character of the acts, whether negligent or otherwise, is necessarily for the jury. Such, we think, was the case here. The theory that the deceased might have seen 623 feet along the railroad in the direction in which the train was approaching, from a point at which he might have stopped the progress of his horse and escaped danger, but did not see it until within 174 feet of him, if considered abstractly, and entirely unshaken by any or every other consideration, would have presented a strong case of negligence; but even then it would scarcely have justified a court in saying there was negligence as a matter of law, when but 17 seconds were allowed for action to the party in danger.

But there were other considerations to be taken into account here. If there was no notice by blowing the whistle, a thing required to be done before reaching the point, and usually done, a traveller accustomed to expect this, would not only not be so likely to look out for danger, or be in such a preparedness to avoid it, as he other-

[Pennsylvania Railroad Company *v.* Ogier.]

wise might have been, and this without any culpable negligence on his part. For, if by the negligence or omission of those in charge of the train his vigilance was allayed, they are not at liberty to impute the consequence of their acts to his want of vigilance, a quality of which they deprived him. If their acts brought him within the boundaries of peril, they must answer for the results of that condition. If, therefore, he had a right to expect to hear the whistle sounded at a sufficient distance from the crossing, and did not, it is evident a different degree of care or vigilance might follow. Care is, undoubtedly, a relative term, or, rather, conveys a relative idea as to the degree necessary to be observed under circumstances. It is different, certainly, when there is reason to apprehend danger, from that degree to be exercised where it is not to be apprehended. Here it may have made a great difference. It seems to me, that if the evidence had satisfied the jury that the whistle had been sounded at the usual place, and the cars had been running at the usual speed, the defendants would not, as the case stood, have been guilty of negligence. But the fault of negligence on one or the other side depended much on this fact. It was in view of this controverted point, that the court were bound to leave the question of negligence on part of the deceased to the jury, against the prayer for instruction to rule it against the plaintiff as a matter of law. We think they did right in doing so. Nor do we see any error on part of the court, in their instructions on the duty of care arising out of the situation of the company and the deceased, or the consequence of it on the part of one or both. This was all fully and fairly explained to the jury.

The last assignment of error has been carefully considered. The court, after substantially laying down the rule administered by this court in Pennsylvania Railroad Company *v.* Zebe and wife, *supra*, added, "much is left, and much must always be left, to your sound discretion." If this sound discretion was sufficiently explained to be circumscribed by the rule of damages applicable to the case, we must presume that the jury so understood it—we can do nothing else. If understood in that sense, it could do no harm. Was this so? The learned judge had before told the jury, that the measure of damages to which the plaintiff would be entitled, if entitled to any, was to be "what the plaintiff had lost in a pecuniary point of view, by the death of her husband, namely, a reasonable support and subsistence for herself;" that "nothing was to be given for grief—for mental sufferings—for lacerated feelings, or disappointed hopes, because these cannot be compensated by money." In connection with the remark complained of, the judge said, "but while making the estimate of the value of the life of the deceased, which you have a right to do, and the consequent damage which the plaintiff has suffered by the death,

[Pennsylvania Railroad Company *v.* Ogier.]

'much is left, and much must always be left, to your sound discretion;'" and, in the conclusion of the charge, he defines this discretion to be "a fair and reasonable discretion, based upon the law and evidence." To intelligent minds these instructions were certainly not incompatible with the rule laid down as the basis upon which to estimate the damages. We cannot, and will not, presume that the jury were other than intelligent men. They were not an accidental part of the tribunal of justice. Juries are an institution of the fundamental law of the land, and we as a court of error can predicate nothing of their errors, or call that an error of instruction which to us is intelligible and right. If the remark were less guarded than it is, we might be obliged to reverse, and we certainly would do so, if we could see that it had the effect to impair the rule that had been correctly exhibited to the jury in the charge.

It is said that a similar remark is to be found in the case of the Pennsylvania Railroad Company *v.* Zebe and wife. So it is. But the object of our remarks in that case was cautionary. We were reasoning of its propriety, to courts; of the necessity of adhering to it; for even then, there would be "much still to be left to the sound discretion of the jury." And we added, "whatever is susceptible of a pecuniary estimate is included within it, and what we have seen was not to be included must be excluded." It was within this limitation the discretion was to be exercised. We intended to invite no escape from the rule, and no court ought so to administer it as to create a doubt about what the rule of compensation is to be. When the rule is accurately stated, it is enough —more may not be error, but this case is a proof that it will always be claimed to be so, even when, after a close investigation, it may be found not to be so; and this demonstrates the propriety of laying down the rule in its plainest and simplest form, consistent with a clear exposition of it. Giving the charge in this case a fair and natural interpretation, we see no error in the points complained of, and the judgment must be affirmed.

Judgment affirmed.