## Seltzer *v.* Philadelphia & Reading Railway Co., Appellant.

*Negligence—Railroads—Passengers—Stations — Alighting from train.*

A railroad company owes to its passengers intending to leave or board a train at a station, a safe means of exit and approach within the space ordinarily and customarily used in connection with the station. Its obligation to protect passengers does not extend beyond the limits of what may properly be considered station facilities or grounds.

Where a railroad company undertakes the transportation of passengers for an agreed price, the contract includes many things. The passenger agrees to be bound by all the company's reasonable rules and regulations for entering, occupying and leaving trains, and if injury befalls him by reason of disregard of the regulations which are necessary for the conduct of the business, the company will not be liable, even though the negligence of one of its servants concurred in causing the mischief.

When a railroad company has provided safe and convenient means of ingress and egress to and from its trains upon one side of its track, it has in this particular discharged its whole duty to passengers, and it is not bound to anticipate that in disregard of its reasonable and known regulations, they will alight from the opposite side.

An occasional alighting and discharging of passengers on the wrong side will not establish a custom permitting passengers to leave on the side opposite to where they are required to leave, or on the nonplatform side. There should be evidence of such continuous use for a period of time that the company's assent to such use may be lawfully inferred.

Where a railroad company has completed the transfer of passengers and is in the act of making up a train before leaving, it is not required in the shifting, or making up of the train, to continuously keep a brakeman at the door of the train to keep passengers from alighting on the wrong side.

Where an employee of a railroad company who is a passenger on an employee's train leaves the train at a space intended for the transfer of passengers from one train to another with which he is familiar, and this space is far from the regular station, and not a part of the station or its facilities, and in doing so the employee alights from the wrong side of the train, and is killed on a track where he has no business to be, his wife cannot recover damages for his death.

In such a case the fact that the company had not constructed a platform some three hundred feet long from the station to the transfer space, has no bearing on the company's liability.

Argued Dec. 3, 1917. Appeal, No. 100, Oct. T., 1917, by defendant, from judgment of C. P. Schuylkill Co., May T., 1913, No. 373, on verdict for plaintiff in case of Mary Seltzer v. Philadelphia & Reading Railway Company. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Reversed.

Trespass to recover damages for the death of plaintiff's husband. Before BRUMM, J.

The facts are stated by the Superior Court as follows:

[The Port Carbon Railroad Company, a subsidiary of the Philadelphia & Reading Railroad Company, running from Pottsville to Tamaqua, has two branches, one known as the Mill Creek Railroad Company and the other as the Schuylkill Valley Railroad Company. These branches join at Mill Creek Junction. Miners from west of the junction and from St. Clair and other points on

the Mill Creek branch are taken over the Schuylkill
Valley branch to the various collieries at which they are
employed.  The trains which carry these employees leave
in the morning and return in the afternoon or evening.
At the point of intersection of these two branches there
is located a small telegraph office, where passengers
might alight and depart from trains.  There were no
tickets sold nor was there an agent at this office, but the
evidence is quite clear that for many years prior to the
accident the company recognized this as a place to re-
ceive and discharge passengers.  When the train from
St. Clair over the Mill Creek or the St. Clair branch ar-
rived at the junction, it met the Schuylkill Valley branch
train.  The meeting time of these two trains was about
one minute apart.  The passengers on either train would
remain in the cars until the other train arrived at the
transfer point.  The meeting place of these trains was
at the intersection of these railroads, where the tracks
formed a "Y."  The St. Clair train stood on one "leg" of
the "Y" while the Schuylkill Valley train stood on the
other.  Both were some feet from the physical intersec-
tion point.  In this position, the passengers on either
train, intending to take the other train to their desti-
nations, transferred.  The place provided by the company
for the transfer was clear of obstructions and there is no
question but that it was a safe place.  In making the
transfer, those leaving or alighting on the Schuylkill
Valley branch did so from the north side of that track.
There was no other track separating it from the Mill
Creek branch railroad.  Those leaving or alighting on
the Mill Creek branch train did so from the south side
of the track of the Mill Creek railroad.  The transfer of
passengers was the only purpose in connection with
passenger traffic for which this place was used.  It is one
hundred to one hundred and twenty feet east of the
telegraph office, or Mill Creek station.  This transfer of
passengers had no immediate or necessary relation to the
discharge or reception of passengers which might occur

at the Mill Creek station.    There was on the north side
of the track a path which led over to the telegraph office.
This was used exclusively by railroad men, and if it be
conceded that it might have been used by the deceased,
it was some distance from the place where he lost his
life.    After the transfer of passengers, the Schuylkill
Valley branch train proceeds on its journey, taking its
passengers eastward to their destinations.    The St. Clair
branch train, which travels from St. Clair with the en-
gine running backwards with two cars attached to it,
pulls west to the Schuylkill Valley branch tracks at a
point some distance west of the telegraph office, or sta-
tion.    The cars are then pushed eastward on these tracks
to a point one hundred feet east of the station.    The en-
gine then uncouples, moves west some few hundred feet,
crosses to a track south of the one on which the two cars
are standing, travels east on this track to a switch some
hundred feet east of the two cars and backs on to the
Schuylkill Valley track to couple to the two cars.    It,
with the two cars, then proceeds headforemost, taking
the passengers east on the Schuylkill Valley branch to
the colliery where they are employed.    The Schuylkill
Valley train goes to Silver Creek colliery, and the St.
Clair train to the Eagle Hill colliery, along the Valley
branch.

Daniel Seltzer, the deceased, lived at Palo Alto, a
small town just west of Mill Creek Junction.    He walked
from his home to Mill Creek Junction intending to go to
work at the Eagle Hill colliery on the St. Clair train.
He had in his possession a number of tickets which were
purchased some time before by him at the colliery and
which were the regular commutation tickets issued by
the railroad to the employees of this colliery.    The cost
was collected by the coal company from the wages of the
employee.    They could be used at any time.    The de-
ceased was not seen after he left his home until he ap-
peared in the two cars as they stood on the Schuylkill
Valley branch after the transfer of passengers had been

309, (1918).] Statement of Facts—Opinion of the Court.

made. The Schuylkill Valley branch train had departed and the St. Clair branch train had been pushed east on the Schuylkill Valley tracks to a point one hundred feet east of Mill Creek station. Seltzer was seen to come in the car nearest the station, sit down for a moment, get up, pass forward and hand to a fellow employee some keys. He then walked out of the car. This was the last seen of him alive. His body was found a few minutes later on the south side of the Schuylkill Valley branch tracks about the center of the car nearest Mill Creek station. At about the time he stepped off the car the engine had uncoupled and was making the "run around" to couple on to the other end of the train so that it might proceed eastward on its journey. It is not denied that the whistle of the engine was sounded several times, the bell was rung continuously, the headlight was burning and in good condition, the view was entirely unobstructed, there was noise from the engine as it approached, but no noise or disturbance to interfere with the warning given to the deceased.]

Verdict and judgment for plaintiff for $1,500. Defendant appealed.

*Error assigned* was in overruling defendant's motion for judgment n. o. v.

*George Ellis* and *John F. Whalen,* for appellant.

*J. O. Ulrich,* with him *E. V. Doyle,* for appellee, cited: Mack v. Pittsburgh Ry. Co., 247 Pa. 598; Fern v. Penna. R. R. Co., 250 Pa. 487; Struble v. Penna. R. R. Co., 226 Pa. 118; Kehoe v. P. & R. Ry. Co., 235 Pa. 429; Powell v. Philadelphia & R. R. R. Co., 220 Pa. 638; Neslie v. Second & Third St. Pass. Ry. Co., 113 Pa. 303.

OPINION BY KEPHART, J., March 2, 1918:

After a careful review of the evidence, we are fully satisfied there was not sufficient evidence to warrant a submission of this case to the jury.

The court below submitted the question of defendant's liability to the jury but failed to take into consideration several essential elements of the case established by well-grounded principles of law.    We may concede that Daniel Seltzer was a passenger as the two cars stood on the tracks.

The plaintiff contends that the company was negligent in running an engine on the south track between Mill Creek station and the transfer station.    A carrier owes to its passengers, intending to leave or board a train at a station, a safe means of exit and approach within the space ordinarily and customarily used in connection with the station.    A person about to cross a railroad for these purposes generally need not stop, look and listen for an approaching train.    If the way provided to pass between the station is across a track, or if the place to alight is between tracks, he may rely on the place being kept safe while he is in the act of passing or alighting: Flanagan v. Philadelphia, Wilmington and Baltimore Railroad Co., 181 Pa. 237; Betts v. Lehigh Val. R. R. Co., 191 Pa. 575; Harper v. Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Co., 219 Pa. 368; Besecker v. Delaware, Lackawanna & Western Railroad Co., 220 Pa. 507; Keifner v. Pittsburgh, Cincinnati, Chicago & St. Louis Railroad Co., 223 Pa. 50; Struble v. Penna. Co., 226 Pa. 118; Weisenberg v. Lackawanna & Wyoming Valley Railroad Co., 237 Pa. 33.    This duty arises in the contract of carriage which is not fully performed until the passenger has reached his place of destination in safety.    The carrier's duty as to station facilities is limited by what is customarily used for those purposes.    Its obligation to protect passengers does not extend beyond the limits of what may properly be considered station facilities or grounds.    This transfer space was some hundred feet distant from the Mill Creek station on the opposite side of the tracks and it was not in use as such transfer station at the time the accident took place.    While we may consider it as being in such use, there is no evidence that persons traveled

from Mill Creek station across intervening tracks and boarded the train from the south side; nor was there any evidence that passengers in leaving these cars crossed over the tracks in the direction of the station. Seltzer was killed when he was apparently traveling away from the station and away from the path on the north side of the tracks. The principles of law as to the use of tracks between trains and stations are not applicable to the case at hand.

Where a railroad company undertakes the transportation of passengers for an agreed price, the contract includes many things. The passenger agrees to be bound by all the company's reasonable rules and regulations for entering, occupying and leaving trains, and if injury befalls him by reason of disregard of the regulations which are necessary to the conduct of the business, the company will not be liable even though the negligence of one of its servants concurred in causing the mischief: Sullivan v. The Philadelphia & Reading Railroad Co., 30 Pa. 234; Deery v. Camden & Atlantic Railroad Co., 163 Pa. 403. Seltzer had for many years traveled to work over these railroads. He knew, or should have known, of the manner of transferring passengers and of the shifting of the engine at this point. It occurred on each morning that he went to work. If he wished to alight from the cars after he was safely on board, it was his duty to have alighted on the north side of the track. That was the way provided by the regulations of the company for the discharge of passengers from this train. When a railroad has provided safe and convenient means of ingress and egress to and from its trains, upon one side of its track, it has in this particular discharged its whole duty to passengers, and it is not bound to anticipate that, in disregard of its reasonable and known regulations, they will alight upon the opposite side: Drake v. Penna. R. Co., 137 Pa. 352; The Penna. R. R. Co. v. Zebe, 33 Pa. 318. Where a person alighted from a train on the opposite side of a station and attempted to cross the tracks to reach a street or other outlet, Mr. Justice

FELL, in Flanagan v. Philadelphia, Wilmington and Baltimore Railroad Co., 181 Pa. 237, supra, said: "If the way provided is across a track he may rely upon the performance by the company of the duty to keep the track clear while passengers are in the act of passing between the train and the station. But·this is when a way is provided and the passenger is impliedly invited to take it. If a passenger disregards the rules of the company by passing to or from the cars on the opposite side from the station or platform provided, he does so at his peril." There may be circumstances arising from some act of the carrier or other sufficient cause, whereby a passenger may be compelled to leave on the wrong side, or the carrier may waive the rule and acquiesce in passengers alighting from a train at an improper place, or on the nonplatform side. When this is done, it must use reasonable care to protect them: Roberts v. Penna. R. R. Co., 238 Pa. 404. An occasional alighting and discharging of passengers on the wrong side will not establish a custom permitting passengers to leave on the side opposite to where they are required to leave, or on the nonplatform side. There should be evidence of such continuous use for a period of time that the company's assent to such use may be lawfully inferred. As was said in Drake v. The Railroad Co., supra, "There was a little evidence to the effect that occasionally a passenger got off there, but none that the company consented to· or knew of it, and the learned judge correctly ruled that the rights and duties of the appellant were not affected by it." Such testimony is inadmissible. The deceased, having left the car on the nonstation side and stepped in front of a moving train, which he must have seen had he but used the slightest care, must be conclusively presumed to have been negligent. He used the wrong side at his own peril. See Goller v. Balt. & Ohio R. R. Co., 229 Pa. 412. Where a passenger undertakes to leave a train at such improper place, his acts present facts so clearly and incontestably features of negligence that it

becomes the duty of the court to pronounce them such as matters of law: Penna. R. R. Co. v. Ogier, 35 Pa. 60. Apart from the contributory negligence of the deceased, it will be observed that the carrier owed him no duty under the circumstances of this case. If it did, it clearly discharged that duty in the manner it operated its engine.

Complaint is made that the appellant failed to obey the rules with respect to placing a brakeman at the end of the cars where passengers alighted to prevent the deceased from leaving on the wrong side. As said in Penna. Railroad Co. v. Zebe, supra: "It was not negligence on the part of the company that they did not by force or barriers prevent the parties from leaving at the wrong side"; and in Margo v. Penna. R. R. Co., 213 Pa. 463: "If it is not the duty of a railroad company to prevent passengers from getting off at the wrong side at a regular station it is less its duty to prevent their getting off not only at the wrong side but at the wrong place, and not intended as a stopping place for passengers." The carrier had completed the transfer of passengers and was in the act of making up its train before leaving. It had discharged the obligation under the rule when the passengers were safely transferred. It was not required, in the shifting or making up of the train, to continuously keep a brakeman at the door of the train.

Girton v. Lehigh Valley Railroad Co., 199 Pa. 147, does not present a situation such as that presented in this case. In that case the space between the platform in front of the station across the intervening tracks to the cinder walk along the westbound track had been filled and leveled up by the company to enable passengers to cross over to and from the depot; that it was the usual and customary way which passengers came to and went from the depot and from trains on the westbound track; and to enable passengers coming on the westbound track to reach the ferry. In such case the jury should pass on the question as to whether or not the grounds as thus in-

dicated were a part of the station as a means of reaching trains from both sides of the tracks.

From what we have said we do not consider the failure to build a platform some three hundred feet along and in front of Mill Creek station up to and along the place where the two passenger cars were located as having any bearing on the carrier's liability. These two places were independent transfer or station points and should not be considered in the light of one continuous station facility.

The failure to properly light the cars was not the proximate cause of the injury. The appellee's evidence shows there was abundance of light from the headlight of the engine.

The judgment is reversed and the record is remitted with direction to enter judgment n. o. v.