# CHARLESTON.

WILLIAM MORRIS' *Admr'x. v.* THE BALTIMORE & OHIO RAILROAD COMPANY *et al.*

(No. 6296)

Submitted March 5, 1929.   Decided March 12, 1929.

98

*P. J. Crogan* and *Kilmer & Byrer,* for plaintiffs in error.
*F. E. Parrack* and *Gibson & Mattingly,* for defendant in error.

HATCHER, JUDGE:

The plaintiff recovered $10,000.00 damages in the circuit court, for the death of her decedent. He was killed by a passenger train of the defendant on the night of December 24, 1926, at a country road crossing, while riding in a Ford coupe owned and driven by his daughter Margaret, aged 19.

The road and the railroad intersect at right angles. The road is straight in the direction from which the coupe came for a distance of 500 feet from the crossing, and the track for a distance of over 3000 feet in the direction from which the train came. The land between is comparatively level; but the view of the track by a traveler approaching the crossing along the road is obstructed to some extent by a cut on the railroad 10 feet in depth, about 700 feet from the crossing and sloping gradually to it, and by a store and garage on the road. At 500 feet from the crossing a traveler on the road can see a train 661 feet from the crossing. As the traveler approaches the crossing his view of the railroad becomes extended except as interrupted by the store, and the garage. The store is about 50 feet from the track, and after passing the store the view of the track from the road is uninterrupted for a distance ranging from 999 feet at the store to 3200 feet within 20 feet of the crossing.

The accident occurred about 10 P. M. The collision is described by the daughter as follows: "* * * it was a bad, foggy night, and we drove slowly down toward Mt. Vernon. When we got down there in sight of the crossing, just about— in good sight of the place where the railroad crosses the road, I looked both ways, of course, as I always did, and glanced my eyes both ways for the train, and I didn't see anything, but saw a light up toward Burke, and I don't remember the words I said to dad, but I called his attention to this light; it was rather faint, it wasn't a pronounced light, but was faint on account of the fog, and I called his attention to that, and he said that was the gob pile that was burning, or slate or whatever it was, put out from the mine; sometimes it flared up, I guess, and sometimes it didn't; so we drove on down toward the store, toward the crossing, slowly I always drove slowly, and that night it was foggy, I couldn't drive fast if I wanted to; and I got down almost to the crossing, practically up to it, I glanced to the right and saw a long light that I supposed was lights from the coach windows from the train; I saw no light at all, only that; no lights on the engine, just a long light, and it seemed to be right against the car, so I just pulled the gas leaver down and went on; and I didn't say

anything, and daddy said, 'Oh', and that is the last I remember he said; and it was just * * * a little bit, until the train hit * * *.'' The witness further states that she was listening as she approached the crossing, and that neither a whistle nor a bell was sounded; that she was not driving faster than ten miles an hour at the time; that her car could have been stopped "pretty quick"; that she did not see the train until the wheels of the coupe were "right up at the rail or on the rail"; that she could have seen the lights of the train after she passed the store if she had looked, but that she was looking at the crossing; that she and her father were thoroughly familiar with the location of the crossing; that the coupe was "all closed up" at the time of the accident except that the glass on the right side was down "a little bit from the top"; and that her father was on the side of the automobile next to the train.

The train consisted of two empty passenger coaches, a baggage car, tender and engine. It was being operated backwards and at a speed of from 15 to 20 miles an hour. The coupe was pushed by the train about 150 feet beyond the crossing. At the place where Miss Morris and her father discussed the light, a train which was more than six or seven hundred feet from the crossing would not have been visible. As the train was moving about twice as rapidly as the automobile, the train must have been about 1000 feet from the crossing at the time of this discussion and consequently did not furnish the light which the occupants of the coupe saw.

The evidence for the defendant is that the engineer blew the regular crossing whistle and set an automatic bell on the engine to ringing at about 1000 feet from the crossing; that an air whistle on the leading car was blown constantly until within a few feet of the crossing; that several lights were lit in the coaches; that on the front of the leading car were two red signal lights commonly called "markers", and a brakeman's lantern; that the conductor, the brakeman and another railroad employee were standing in the vestibule of the leading car; that these three saw the automobile approaching along the road before it passed the store; that they thought the automobile would probably stop for the crossing until

after it passed the store; that the emergency brake could be applied from the rear of the train as well as from the engine; and that it was so applied when the front of the leading car was about 35 feet from the crossing. An expert testifying for defendant was of opinion that at 15 miles per hour the train could be stopped at about 220 feet, and at 18 miles per hour at about 312 feet. It does not appear how far from the train one should have heard the air whistle. Neither the engineer nor the fireman states that he heard it. It was heard by Mrs. Robert Wolfe, who resides at the store, and by C. J. Bolyard, who resides about 59 feet from the crossing. But his wife, who stated that she heard the steam whistle, did not hear the air whistle. The wife of decedent and another witness, both of whom were near enough to have heard the statutory signals, say that they did not hear them. The evidence does not disclose how far the lantern and the markers made the track visible in front of the leading car.

The defendant contends (1) that it was entirely free from negligence; (2) that the decedent was guilty of gross negligence; (3) that plaintiff was permitted to introduce improper evidence; and (4) that it was prejudiced in the giving and refusal of certain instructions.

(1) It is recognized by all the authorities that the operation of a train backwards at night over a road crossing is attendant with a great amount of danger to travelers, and consequently a railroad company should use the utmost care to prevent injury. 33 Cyc., 954; *Waid* v. *C. & O. Ry. Co.*, 14 Fed. (2nd Series) 90, 92. In *Bowles* v. *C. & O. Ry. Co.*, 61 W. Va. 272, 275, this Court virtually held that the means of warning should be as effective on a backing train as on an advancing unreversed train. That requirement seems eminently fair to railroads, in consideration of the fact that a train is ordinarily just as dangerous, if not more so, when backing, as when proceeding forward. The opinion in the *Bowles* case quotes from Wood on Railroads as follows: "As a matter of common knowledge such a practice is peculiarly dangerous, and therefore creates a duty of unusual care on the part of the company. There should be abundant warning, not only by the usual signals of bell and whistle, but

there should be a flagman near the track, or a watchman on the nearest approaching car to warn travelers who are near. In this as in other cases the exact measure of the company's duty, and the question as to whether it has been discharged, is for the jury." It is beyond question that the headlight on an advancing unreversed train at night, ordinarily gives ample warning, particularly on a long straight track such as the one approaching this crossing. The evidence as to the effectiveness of the signals given by defendant on this occasion does not arise to that high degree of certainty which would justify a finding as a matter of law that they were as efficient as a headlight would have been. Therefore under the express authority of the *Bowles* case, the question of whether the defendant fully discharged its duty was for the jury.

(2) We are not directly concerned in this case with the conduct of Miss Morris. Her attitude is not imputable to the decedent. It was his duty to exercise personal care for his own safety. *Young Adm'r.* v. *Ry. Co.*, 96 W. Va. 534; *Jameson* v. *Ry. Co.*, 97 W. Va. 119. There is no direct evidence as to his conduct except at the point 500 feet from the crossing. There he was shown to have been looking in the direction from which the train came. His negligence must appear affirmatively. In the absence of proof, it will be presumed that he exercised ordinary care, his safety being involved. This is established law. See opinion in *U. S. Director General of Railroads* v. *Zanzinger*, 269 Fed. 552; *Weller* v. *Railroad Co.*, 164 Mo. 180; *The Receivers* v. *Friend's Adm'r.*, 95 Va. 125. If the decedent be accorded this presumption, then the charge of culpable negligence must fail, unless the signals given by the railroad company were so effective that the decedent would necessarily have observed and comprehended them had he looked or listened. Red lights are always on the rear of an unreversed train. Their purpose, as understood by layman, is to give warning to any other train which may be following. A brakeman's lantern sitting in the vestibule beneath the red lights would have no special significance to a layman. Had decedent observed the red lights on the train that night, he would have been warranted in believing that they were on the rear of an unre-

versed train, unless he could have noted the reverse movement. From maps in evidence, it is questionable whether the train could have been plainly observed that night irrespective of the fog, until the coupe had passed the store. The lights were advancing in almost a straight course toward the space between the store and the crossing. For that reason it would have required very close observation to have detected whether the lights were moving or stationary. Therefore, even had the decedent noticed the red lights and heard the whistle, he would not necessarily have been cognizant of danger, if he had not also observed the reverse movement of the train. A headlight is expected on the front of an advancing t rain—not red lights and a brakeman's lantern. Without other substantial warning, travelers cannot be expected to understand that in some special instances red lights and a lantern denote an oncoming train. "The red light on the end of the tender was no notice of the approaching train. If the travelers saw the red light, it does not follow that they could see it move towards them, for it would seem nearly stationary as they looked at it. Red lights on the rear of trains are indications of danger to those in the rear. They have not been used upon the front of trains as a warning to travelers." *Gorton* v. *Harmon,* 152 Mich. 473, 476. The duty of the decedent to look and listen depended on whether "it would have availed him had he looked and listened." Whether decedent would have comprehended the danger of the situation had he looked and listened was a jury question. *Parsons Adm'r.* v. *R. Co.,* 209 N. Y. 226.

Suppose, however, we assume that the decedent must have noted the movement of the train had he looked, and therefore presume that he did not look. Even then we cannot hold him guilty of gross negligence as a matter of law, as the defendant contends. All courts, so far as I am advised, generally impose upon one who attempts to cross a railroad track the duty to look and listen in such manner as would be effective, for the approach of a train. *Cavendish* v. *Ry. Co.,* 95 W. Va. 490; *Robinson* v. *Ry. Co.,* 90 W. Va. 411. Some courts, notably the Pennsylvania court, hold that a failure to perform that duty is negligence *per se.* See annotations 41 A. L. R.,

p. 405. Other courts, including the West Virginia Court, have refused to subscribe to the so-called Pennsylvania, or absolute rule, which admits of no exception. In *City of Elkins* v. *Ry. Co.*, 76 W. Va. 733, 736, the Pennsylvania rule was expressly rejected as "contrary to sound reason, and to the great weight of authority on the subject", and it was held that whether one has been negligent in such case, is generally "a mixed question of law and fact to be submitted to the jury." It is true that *Cline* v. *McAdoo*, 85 W. Va. 524, leaned toward the Pennsylvania rule; but that tendency was forthwith corrected in *Casdorph* v. *Hines*, 89 W. Va. 448, which holds: "A traveler approaching a crossing is under no absolute duty to stop, look and listen for approaching trains under any and all circumstances. The failure so to do is no more than a circumstance for the jury to consider in determining the degree of care exercised by him." The *Cline* case was criticised in *Bonar* v. *Ry. Co.*, 91 W. Va. 462, 465, and the rule in *City of Elkins* v. *Ry. Co.* reasserted. Another lapse was suffered in *Gray* v. *Ry. Co.*, 99 W. Va. 575; but loyalty to the *City of Elkins* case was proclaimed in *Kelly* v. *Ry. Co.*, 99 W. Va. 568, 573, and in *Coleman* v. *Ry. Co.*, 100 W. Va. 679, 686. When we contemplate the infidelity of this Court to the *City of Elkins* case, it is some comfort to know that the Pennsylvania court has not always been faithful to the doctrine which bears its name. It also has had moments of dalliance with an alien tenet. See *Ry. Co.* v. *Weber*, 76 Pa. 157; *Rr. Co.* v. *Carr*, 99 Pa. 505; *Schum* v. *Rr. Co.*, 107 Pa. 9; *Bard* v. *Ry. Co.*, 199 Pa. 94. We are not at all certain now that the Pennsylvania doctrine is against the weight of authority, as the annotation *supra* indicates a comparatively equal division of decisions. We are still of opinion, however, that the doctrine is not consistent with "sound reason". Our opposition thereto is fairly supported by an earlier Pennsylvania case which holds: "A defendant cannot impute a want of vigilance to one injured by his act, as negligence, if that very want of vigilance were the consequence of an omission of duty on the part of the defendant." *Ry. Co.* v. *Ogier*, 35 Pa. 60. In accord with our *City of Elkins* case are *Clark* v. *Rr. Co.*, 164 Mass. 434, 438-9; *Fergu-*

*son* v. *R. Co.*, (Wis.) 23 N. W. 123, 125; *Kimball & Fink, Receivers* v. *Friend's Adm'r.*, 95 Va. 125, 138; Beach on Contributory Negligence (3rd ed.), section 181; Bailey's Conflict of Judicial Decisions, p. 268, *et seq.*; Wood on Railroads (2nd ed.), p. 1530; and the many cases cited in the annotation, *supra*, p. 420.

Travelers have the right to assume that trains will give the usual signals at crossings. *City of Elkins* v. *Ry. Co., supra,* p. 738; *Ry. Co.* v. *Shores,* 40 Okla. 75; *Tabor* v. *Rr. Co.,* 46 Mo. 353; *Smith* v. *Rr. Co.,* 70 N. H. 53; *Southern Ry.* v. *Abee,* (Va.) 98 S. E. 31, 33; *Draiss* v. *Payne, Agt.,* 158 La. 652, 658; *Stanley* v. *Rr. Co.,* 120 N. C. 514; *Morgan* v. *Rr. Co.,* 162 Mich. 573, 577; 33 Cyc., p. 1031. The usual signal of an approaching train at night is its powerful headlight illuminating the darkness far in advance of the engine. The decedent had the right to assume as he neared the crossing that the promixity of a train would be so announced. That announcement was not made. An omission of customary signals by a railroad company is virtually a representation ("assurance") that no train is approaching. *Ernst Ex.* v. *Rr. Co.,* 35 N. Y. 1. The absence of the warning light on the crossing may have caused decedent to relax his vigilance. If, in the opinion of the jury, the absence of illumination from a headlight at the crossing would have misled a man of ordinary prudence as to the approach of the train, then that circumstance should have been considered by the jury in connection with all the other facts surrounding the accident in determining the degree of care exercised by the decedent. *Casdorph* v. *Hines, supra; Coleman* v. *Ry. Co., supra.* "When, by reason of an omission or a neglect to sound the whistle or ring the bell of a locomotive as it is approaching a dangerous crossing, the vigilance of a traveler upon the wagon road is allayed, and he is led into a position or situation in which his life is jeopardized and finally lost, his lack of vigilance cannot be held to amount to culpable or concurring negligence as a matter of law." *Hendrickson* v. *Ry. Co.,* 49 Minn. 245. Accord: *Weller* v. *Rr. Co., supra; Russell* v. *Ry. Co.,* 118 N. C. 1098; *Nash* v. *Ry. Co.,* 1 N. Y. Supp. 269, 271; *R. Co.* v. *Yundt,* 78 Ind. 373, 376; *Van Anken* v. *Ry. Co.,* 96

Mich. 307; *Wolcott* v. *R. Co.*, 68 N. J. L. 421; *Santore* v. *Rr. Co.*, 203 Mass. 437, 440-1-2; *The Receivers* v. *Friend's Adm'r., supra; Ry. Co.* v. *Shores, supra;* Elliott on Railroads (3rd. ed.), Vol. 3, section 1660, p. 545. ·We are not unmindful of *Berkeley* v. *C. & O. Ry. Co.*, 43 W. Va. 11; *Beyel* v. *R. Co.*, 34 W. Va. 538, and the other cases cited by defendant; and it is not the purpose of this opinion to relax the requirement that the traveler employ ordinary care for his own protection upon all occasions when crossing a track. But care is a relative term; and the degree of care constituting "ordinary care" necessarily varies with circumstances. "It is different, certainly, when there is reason to apprehend danger, from that degree to be exercised where it is not to· be apprehended." *Ry. Co.* v. *Ogier, supra,* p. 72. We simply hold that a traveler's failure to look and listen in the usual manner does not in every case evince failure to use ordinary care as a matter of law, but that circumstances may arise which make the question one for the jury. *Rodrian* v. *Rr. Co.*, 125 N. Y. 526, 529.

(3) A witness for plaintiff, Gail Gibson, was permitted to say "all trains ever I saw that stopped in emergency would stop almost sudden unless they were going at a high rate of speed." As the witness had never assisted in the actual operation of trains, the defendant contends that his observation was improper. Another witness for plaintiff, Guy Shaffer, was permitted to give his opinion that the air brakes should have stopped the train in question within sixty feet. The witness had served as brakeman on a freight train, but was without experience on passenger trains. The defendant contends that he was not qualified to express an opinion. The evidence shows that the collision broke the air connections, and that whenever they are broken the brakes go on automatically. The train actually ran some one hundred and fifty feet beyond the crossing before stopping. If the brakes were applied by the trainmen as they testify, ·the train ran about one hundred eighty-five feet before stopping; if they were not applied until the collision, it ran about one hundred fifty feet before stopping. Either contingency excludes the evidence of Gibson and Shaffer, and its admission was accordingly harmless.

(4) Instruction No. 1 for the plaintiff is condemned by defendant because it submitted to the jury whether the train was being operated at a "dangerously rapid rate of speed" and whether a "proper lookout" was maintained. A dangerous rate of speed is another relative term, and is dependent entirely on the facts of each case. 33 Cyc. 971. Being dependent on circumstances, it was not improper to submit the matter to the jury. The purpose of a lookout on a backing train is obviously "to prevent injury." 33 Cyc. 961. The mere standing of the employees at the post of lookout on the train in question did not of itself meet the requirement of *proper* lookout. It is what those employees did to prevent injury to the decedent that determines whether or not a proper lookout was maintained—a pertinent inquiry for the jury. The instruction is also criticised because it is binding, but does not submit directly to the jury the question of the decedent's negligence. The charge of the instruction was made dependent on the finding by the jury that the high rate of speed of defendant's train or the failure to keep a proper lookout or both *proximately caused* the death of the decedent. If the jury found the defendant negligent and that such negligence was the proximate cause of the accident, that finding necessarily exonerated the decedent from culpaable negligence. The instruction would have been less abstract if the negligence of the decedent had been specifically mentioned, but it is not necessarily prejudicial for that reason.

The points raised against plaintiff's instructions Nos. 3 and 8 are not in harmony with the principles announced herein. Plaintiff's instruction No. 6 is objected to because it makes reference to a conflict between testimony and physical facts, the defendant contending there was no such conflict. If so, we cannot infer that the defendant was prejudiced, the presumption being that the jury discarded the instruction.

Plaintiff's instruction No. 7 informed the jury that it could disregard the entire evidence of a witness, etc., if he testified falsely as to a material fact, omitting a qualifying word such as "wilfully" before the word "falsely". The omission rendered the instruction technically imperfect, but

that reason alone is not cause for reversal. *State* v. *Symanski*, 104 W. Va. 231.

Plaintiff's instruction No. 9 fixed the measure of plaintiff's damages at such sum as the jury believed would "compensate her for her husband's death not to exceed $10,000.00". The defendant contends that compensation is not the proper measure of damages under the statute, which provides that the jury shall give such damages as it shall deem "fair and just not exceeding $10,000.00". See Code, Chapter 103, section 6. Our statute, is identical with that of Virginia. We have explicitly approved the construction given it by the Virginia court. *Kelly* v. *Rr. Co.*, 58 W. Va. 216, 223. In an unbroken line of decisions the Virginia court has held that not only compensatory damages may be awarded under the statute, but also exemplary damages in case the facts warrant it. *Matthews* v. *Warner's Admr.*, 29 Gratt, 570; *B. & O. Rr. Co.* v. *Noel's Admr.*, 32 Gratt. 394; *Portsmouth St. R. Co.* v. *Peed*, 102 Va. 662; *N. & W. Ry. Co.* v. *Cheatwood's Admrx.*, 103 Va. 356; *C. & O. Ry. Co.* v. *Ghee*, 110 Va. 527. In the *Ghee* case a point in the syllabus is as follows: "In an action by a widow to recover for the wrongful death of her husband the jury may, in addition to the pecuniary loss sustained by her, add compensation for the loss of his care, attention and society, and also such further sum as they may deem fair and just by way of solace and comfort to her for the sorrow, suffering and mental anguish occasioned to her by his death." See also *Wigel* v. *Parkersburg*, 74 W. Va. 26.

The defendant contends further that there was no basis in the evidence for the instruction. It was shown that the age of the decedent was 51 years, and that he worked daily in the mines near his home. After the defendant had rested, but before the case was closed, the plaintiff offered to prove that the decedent earned $200.00 a month. This offer was refused by the court upon the objection of the defendant. It appears to us that the offer was timely. However, the fact that the decedent labored daily in the mines evidences both his health and his worth to his family. The exact amount of his earnings was not necessary as a basis for the verdict. Besides, the defendant having improperly caused its exclusion from

the jury, will not now be heard to say that the *quantum* of the verdict is not sufficiently sustained. *Truschel* v. *Amusement Co.,* 102 W. Va. 215.

Several instructions offered by defendant were refused. They are either covered by other instructions which were given, or are not in harmony with the principles announced herein, or are not necessary to the decision. Their refusal was not error.

Perceiving no error prejudicial to the defendant, the judgment of the trial court is affirmed.

*Affirmed.*