C. E. Jones *v.* Virginian Railway Company

(No. 7953)

Submitted November 21, 1934.  Decided December 11, 1934.

*John R. Pendleton,* for plaintiff in error.
*J. Winston Read, Koontz, Hurlbutt & Revercomb* and *Harry B. Lambert,* for defendant in error.

KENNA, JUDGE:

C. E. Jones brought this action of trespass on the case against the Virginian Railway Company in the Common Pleas Court of Kanawha County. From a verdict and judgment for the plaintiff for $2,000.00, defendant prosecutes error. Plaintiff filed a declaration in three counts, averring the circumstances under which he received severe personal injuries in a collision of an automobile in which he was riding with a locomotive of the defendant in the City of Charleston at the Greenbrier Street crossing of defendant's (same as New York Central's) line on the morning of September 7, 1932, at about nine o'clock. The first count is based on excessive speed of the train at the crossing, the second on speed in violation of a city

ordinance, and the third on violation of city ordinances requiring defendant to mark the crossing with the word "stop" and to keep its right of way free from obstructions to the view at crossings.

The ordinances pleaded were properly introduced in evidence.

In his own behalf, the plaintiff testified that on the morning of the 7th of September at a little after nine o'clock, he and Dr. Gamble started in Dr. Gamble's Ford coupe to go to 306 Bibby Street; that the car was a little hard starting and that they started very slowly and were traveling in second gear; that he, plaintiff, was looking straight ahead and to his right as they approached the crossing from the south at about four miles an hour, a speed at which the car could be almost instantly stopped. The plaintiff testified that as they started out, and while some distance from the crossing, he noticed a sign indicating the railroad crossing. He said that he did not see the signal lights flashing as they approached the track, and heard no gong being sounded; that he did not see or apprehend danger until he heard Dr. Gamble exclaim "Oh, train" at the instant of impact. Plaintiff testified that he had never been at that particular crossing before, and knew nothing about it, and relied upon Dr. Gamble entirely; that as they went on to the crossing, he was just casually looking around and was not looking for anything in particular; that he had no idea of a train because he saw no light and nothing to indicate, and that he was just going on leisurely. He states that he was a stranger and assumed that Dr. Gamble knew all about what was going on "with perfect ease." He says nothing of the speed of the train.

William L. Spriggs, a nephew of Dr. Gamble, introduced certain photographs taken by him on the day of the accident at the Greenbrier Street crossing. These pictures show five different views of the automobile that was in the collision, and one view looking west from a point just east of Greenbrier Street.

Andrew Pack testified for the plaintiff as to the condition of weed growth upon property occupied by him

abutting upon Greenbrier Street and upon the right of way of defendant's line to the west of Greenbrier Street and to the south of the right of way, stating that there was at that point a dense growth of morning glories and other weeds upon a six-foot wire fence, and that along the right of way there were several trees, some of them approximately 20 feet high; that this growth was 20 or 25 feet from the railroad track, and that in September, on the 7th, it was in full leaf and foliage. This witness did not place any of this growth as actually growing upon the defendant's right of way, and on cross-examination, stated that after a person got by the fence approaching the railroad going toward the hill on Greenbrier Street, there was nothing to obstruct the view and approaching trains could be seen quite a way from that point.

L. L. Pullen testified for the plaintiff that he lived at 1603 Piedmont Road in Charleston near Greenbrier Street; that on the morning of the accident he was walking down Greenbrier Street traveling south, that being the opposite direction from the one in which the Gamble car was approaching the crossing; that the engine struck the automobile after he had crossed; that he saw the train and the automobile collide from a distance of only 20 or 25 feet; that he crossed over the track in front of the train, which, in his opinion, was traveling at a rather high rate of speed between 30 and 40 miles an hour; that he did not hear the whistle of the locomotive, but that he did see the lights flashing on the Piedmont Road side of the crossing (opposite from the side from which the Gamble car approached the crossing) but that he did not get far enough across to see whether the lights on the other side were flashing or not; that it seemed to him that the foremost part of the engine struck the side of the car; that the train did not slow down before hitting the car and that it stopped with the last car on the crossing; that just before the accident, a car traveling in the same direction that he was traveling crossed the tracks and he had cause to look at it because he thought the driver took quite a chance in crossing when he did; that he, himself,

as a matter of fact, ran across the crossing. On cross-examination, this witness stated that he thought the Gamble car was traveling approximately 20 miles an hour, and that he further thought that he, himself, was taking quite a chance in crossing the railroad under the circumstances.

In addition, the plaintiff introduced medical testimony as to the extent of his injuries which need not be narrated since there seems to be no contest on this point.

On behalf of the defendant, H. S. Gay was introduced who testified that he was a civil engineer and that he had prepared a map of the crossing and general scene of the accident portraying all details exactly to scale, with correct distances and relative locations. This map was introduced in evidence and forms the basis of much of the subsequent testimony.

J. M. Goodwin, claim agent for the defendant, testified that he had taken the photograph introduced as defendant's exhibit No. 8 from a position between the rails of the main line at the Greenbrier Street crossing looking west; a photograph, introduced as defendant's exhibit No. 9, from a position 20 feet south of the main line in Greenbrier Street, looking west; a photograph, introduced as defendant's exhibit No. 10, showing the signal devices on the south side of the Greenbrier Street crossing; and a photograph, introduced as defendant's exhibit No. 11, showing the view of a person standing 30 feet south of the center of the main track in Greenbrier Street looking west.

H. C. Jacobs, the locomotive engineer who drove the train involved in the accident, testified on behalf of the defendant that his train was traveling at a speed of fifteen miles an hour; that the automatic bell on the locomotive had been started when it left the station approximately a mile west of the point of the collision and was ringing until after the accident happened and that the crossing whistle was blown not only for the Greenbrier Street crossing, but for the crossing below. This witness testified that he was watching the track ahead and did not see the automobile approaching the track until almost

at the moment of impact; that he applied the emergency brakes, shut the throttle off, opened the sand and stopped as quickly as he could. He testified further that after the accident he examined the signal lights south of the crossing and found them flashing, and that the crossing gong was ringing until they became tired of listening to it and stopped it themselves after the accident. He stated that the train was composed of a baggage car, two coaches and a club car, and that when it came to a stop, the club car was entirely west of the crossing and the last coach was on it; that these cars are each approximately eighty feet long and the engine eighty-five feet long.

W. C. Counts, the fireman on the train, testified as to the speed of the train, the condition of the crossing gong and lights, the sounding of the locomotive bell and whistle, and the manner of the train's stopping, substantially as did the engineer.

T. C. Kelly, the conductor on the train, testified to substantially the same circumstances.

E. E. Kincaid, who was the brakeman, testified to substantially the same circumstances as did the conductor.

J. W. Scarbrough, a New York Central watchman, testified that he was on duty at the switch tower just west of the Greenbrier Street crossing and that it was his duty to throw the switch that put the gong and the signal lights at the crossing in operation; that he did throw it upon the approach of the train to the Elizabeth Street crossing, two streets below Greenbrier, that morning and that he knows that both the gong and the lights went into proper operation before the train reached the Greenbrier Street crossing. He further testified that the locomotive bell was sounding and that the whistle was blown for the Greenbrier Street crossing.

L. H. Young, called for the defendant, testified that immediately before the accident he drove his automobile southward on Greenbrier Street and over the crossing just ahead of the train; that as he drove down Greenbrier Street, he heard the crossing gong and saw the lights at the crossing flashing; he stated that he heard

the engine of the approaching train blow for the crossing, and that the passenger in the back seat of his car spoke up and said that they could make it across; that he passed over the crossing in front of the train, and consequently had his back to the accident when it occurred, and that after it occurred, he stopped his car and went back.

H. Pickens testified that he was the lampman for the New York Central Railway whose duty it was to keep the crossing lights and gong in proper operation, and that he had inspected those at Greenbrier Street at about eight o'clock on the morning of the accident, and had found them in good operating condition.

J. H. Sawyer testified that he was employed by the New York Central Railway Company as its signal maintainer and described the signal system at Greenbrier Street. He stated that the flashing lights on the sides of the crossing in Greenbrier Street and the gong on the north side, were on the same circuit and were controlled by a switch in the signal tower at Carolina Street; that the lights flashed alternately between thirty and forty-five times a minute, and could be seen a distance of about 300 feet, and that the gong, when in operation, made a continuous clanking noise.

Mrs. Joe Bettinger testified that she lived on Greenbrier Street about 150 feet from the crossing, and that at the time of the accident she was upstairs in the bedroom window of her home; that she heard the train approaching and heard it blow for the crossing before it was in sight; that she heard the bells ringing and the whistle blowing so shrilly that it attracted her attention, and that when she looked out of the window, the train was passing over the crossing and she knew from the commotion that it had struck something; that she heard the crossing bell.

E. S. McLean testified that he was in the back seat of the Young automobile when it came out Piedmont Road on the morning of the accident and that he was late going to his office; that as they approached the crossing, the bell was ringing and the lights were flashing, and that as

he looked down the track the train was about at Carolina Street, the next crossing below Greenbrier Street; that he told Young he had plenty of time to go ahead and Young went across the crossing; that after they had crossed, Mrs. Young looked back and exclaimed that the train had got that man; that they stopped after they had passed over the crossing about 100 yards; and that he paid no attention to the lights on the Kanawha River (south) side of the Greenbrier Street crossing; that at the south side of the crossing, the view is clear and that there is no reason why a man should not see an approaching train in plenty of distance to stop, or as he estimated it, at least a block away.

On cross-examination, he said that he did not remember hearing a whistle blow.

H. D. Adkins testified that at the time of the accident he was at the end of Railway Avenue on Greenbrier Street (a lane running west from the crossing and along the south line of the railway right of way) ; that he had just passed over the crossing, traveling south on Greenbrier Street; that the flashing lights were operating on both sides of the crossing before the train reached that point, and that he saw the Gamble car approaching; that its two occupants were looking directly ahead, neither looking to the right nor to the left, and that the car struck the front end of the engine at about the cylinder rod; that he heard both the whistle and the bell of the approaching train at a time when it was approximately at Carolina Street; that from where he was standing, he could plainly see it, and that in his judgment, the train was making approximately fifteen miles an hour.

H. L. Winkler testified that he lived on Greenbrier Street in the city of Charleston close to the home of Dr. Gamble and that at the time of the accident he was standing on the east side of Greenbrier Street about eighteen inches from the south track; that from where he was standing he could not see the electric light signals, but that he heard the train whistle and heard the crossing gong; that he saw the Gamble car approaching the crossing at a speed he estimates at from 12 to 15 miles an

hour; that it did not check its speed and that the automomile struck the engine back of the cylinder; that after the accident, the conductor took his name and called his attention to the fact that the signal lights were still flashing; that in approaching the crossing from the south, you can very easily see down to Elizabeth Street; that when you get up to where the lights are, you can see down as far as Ruffner Avenue; that he was on the railroad at Carolina Street the morning that Pickens came to test the lights and saw him make the test; that at the time of the test, he heard the signal bell ringing at the crossing.

W. D. Winkler testified that on the morning of the accident he was about 80 feet west of the Greenbrier Street crossing standing beside the southern track at the time of the accident; that from this position he heard the train whistle as it came near Ruffner Avenue and that from that position he could see the train coming for a half a mile; that he observed it blow for the crossings at Ruffner Avenue, Elizabeth Street, Carolina Street and before it got to Greenbrier Street; that the engine bell was ringing as was the gong at the crossing; that it was the gong that first attracted his attention to the approaching train; that from where he stood he could see the flashing lights on the side of the crossing toward him (the side toward him with reference to the directions east and west) ; that the automobile ran into the side of the engine within six or eight feet of the cowcatcher; that after the accident, the conductor called his attention to the fact that the lights at the south of the crossing were operating.

H. K. Polan testified that he was on the train the morning of the accident; that he is employed by the Virginian Railway Company as its watch inspector, and that after the train left the station that morning he heard the whistle blown for several crossings and that after the accident, he having gotten off the train, heard the signal gong ringing and saw the signal lights operating on the south side of the crossing.

W. E. Hamm testified that at the time of the accident,

he was walking between the tracks of the railroad about 300 feet east of Greenbrier Street and that he heard the engine whistle for the Greenbrier Street crossing, which fact caused him to step off the track where he was walking. He went back to the scene of the accident and did not notice either the gong or the signal lights.

We have not recounted in detail the testimony concerning the obstruction of the view at the crossing by growth upon the railway right of way because we think there can be no doubt of the clear and decisive proof of the defendant on this question. We are of the opinion that the plain and overwhelming preponderance of the evidence is for the defendant on this question, and that no reasonable mind could doubt this to be fact. Between the tracks on which the train was running and the fence upon which the vines were growing (and it does not seem that any of the foliage was actually growing on the railway right of way although a part of it probably did overhang and encroach upon the right of way), there lies another track and a lane or road at least broad enough to permit the passage of automobiles east and west. The proof shows that the line of this fence, protracted across Greenbrier Street, would be thirty feet south of the south rail of the track upon which the train was running, and that a person standing in this line on Greenbrier Street would have a clear and unobstructed view of the railway for several hundred feet. From a point just inside of the protracted line and before reaching the southmost track, and while within ample stopping distance for an automobile proceeding with proper care over a railway crossing, a photograph introduced as defendant's exhibit No. 9 shows an unobstructed view of the railroad which, without doubt, extends far beyond the distance required for safe crossing, regardless of the speed of the oncoming train.

We cannot fail to reach the same conclusion with reference to the blowing of the whistle and the sounding of the engine bell for this particular crossing. It is true that the plaintiff and some two or three other witnesses have testified that they did not hear these signals, and it is true that under some circumstances this negative proof

is to be given the same effect as affirmative statements. However, we do not believe that in this case testimony of this nature is properly to be given that comparative weight. None of the negative statements, including that of the plaintiff, comes from a witness who was giving any particular attention to the matter of the train's signals and none of them states that he or she would have heard the signal had it been given. No one of them undertakes to state unequivocally that the train signals were not given. As against this statement, we have the positive assertions of four members of the train crew, of Polan, of the two Winklers, of the tower signalman, of Mrs. Bettinger, of Young, of Adkins, and of Hamm to the effect that they did hear the engine signals. We cannot resist the conclusion that under these circumstances, all reasonable minds must unite upon the belief that these signals were given. *Cavendish* v. *Railway Co.,* 95 W. Va. 490, 121 S. E. 498.

Without going thoroughly into a discussion which we think is obviated by the detailed statement of the testimony, we reach the same conclusion with reference to the operation of the gong and signal lights at the crossing. We are very much inclined to believe, too, that the fact of whether or not these signal lights and crossing gong were operating on the morning of the accident is not in issue as a matter of actionable negligence. The declaration avers the ordinance and the duty to maintain these signals. It does not, however, contain an averment stating that this particular duty was not performed by the railway company.

There is conflict in the evidence as to the speed of the train, and therefore that question is to be viewed most favorably to the theory of the plaintiff, which puts it at thirty to forty miles an hour and at a rate that is violative of the city ordinance. Under the West Virginia rule in order that the violation of an ordinance itself should furnish the basis of recovery, it must be shown that the breach of the ordinance was the proximate cause of the plaintiff's injury. *Ambrose* v. *Young,* 100 W. Va. 452, 130 S. E. 810; *Oldfield* v. *Woodall,* 113 W. Va. 35, 166 S.

676

E. 691. See also, *Steiner* v. *Muldrew,* 114 W. Va. 801, 173 S. E. 891. In this case, the proof on that question is slight. Of course, it might be argued that if the train had been running at only fifteen miles an hour, plaintiff could have passed over the crossing before it reached the point of impact. On the other hand, it could just as plausibly be urged that if it had been traveling at a greater rate of speed than it in fact was, the train would have cleared the crossing before the plaintiff came along. The relative positions of the train and of the Gamble car at any time prior to the moment of impact are not shown. Neither is the time required to stop the train at the speed it was running, as compared with the time required to stop it at the rate of speed prescribed by the ordinance, proven. On the whole, we think it is a rather delicately balanced question whether the plaintiff has sufficiently shown that the speed of the train, under all the circumstances of this case, could have been the proximate cause of the plaintiff's injury. We are of opinion, however, that the correct rule where it is shown that the speed of the train has been in violation of an ordinance, is that that is a circumstance from which a jury might infer negligence. See *Grand Trunk Line Railway Co.* v. *Ives,* 144 U. S. 408, 418, 36 L. Ed. 485, where the Supreme Court, after reviewing the cases on the question, states: "But, perhaps, the better and more generally accepted rule is that such an act on the part of the railway company is always to be considered by the jury as at least a circumstance from which negligence might be inferred in determining whether the company was or was not guilty of negligence." While the court here speaks of negligence, it seems clear that, under the West Virginia rule, the same reasoning would have to be applied to the question of proximate cause, arriving at the conclusion that its existence, being an element of actionable negligence, would, in such case, be a jury question. We, therefore, are of opinion that in so far as the prima facie showing of the defendant's negligence is concerned, the plaintiff had introduced sufficient proof to go to the jury.

The most serious question in the case, however, is the

conduct of Dr. Gamble and of the plaintiff. As we have heretofore stated, this record is sufficient to establish the fact that the crossing lights in the sign set in the middle of Greenbrier Street were operating. These signs themselves are designed to be conspicuous. They are set in a concrete base several feet in circumference and some two or three feet high, from which arises a post some six or seven feet above it, at the top of which is the familiar cross with the words "railroad crossing" conspicuously painted on it. Beneath this cross some two or three feet and some five or six feet from the ground, are the twin crossing lights which flash alternately. This is the post that the plaintiff admits he saw some distance from the crossing. The fact of the crossing gong having sounded, we think, has been shown. In addition, we are of opinion that the fact of the whistle having been sounded and the bell rung for this crossing has been established. Under the conditions shown, we cannot help being of opinion that his own conduct was the direct and proximate cause of Dr. Gamble's lamentable death. This, of course, under our holdings, does not charge the plaintiff. *Young* v. *Railroad Co.*, 96 W. Va. 534, 123 S. E. 433; *Pierce* v. *Railroad Co.*, 99 W. Va. 313, 128 S. E. 832; *Morris* v. *Railroad Co.*, 107 W. Va. 97, 147 S. E. 547. Nevertheless, the plaintiff owed a plain duty to exercise reasonable care for his own safety. *Jameson* v. *Railway Co.*, 97 W. Va. 119, 124 S. E. 491; *Pierce* v. *Railroad Co.*, 99 W. Va. 313, 128 S. E. 832; *Thomas* v. *Railway Co.*, 99 W. Va. 718, 130 S. E. 679; *Morris* v. *Railroad Co.*, 107 W. Va. 97, 147 S. E. 547; *Waller* v. *Railway Co.*, 108 W. Va. 576, 152 S. E. 13. We do not believe that we are called upon here to draw a distinction between the obnoxious meddlesomeness of a backseat driver and the legitimate responsibility for his own safety of the ordinarily observant and cautious person. It seems to us something more than obvious that the plaintiff's failure to observe the crossing lights, his failure to hear the crossing gong, his failure to hear either the bell or the whistle on the locomotive, and his failure to see the approaching train at any time before the actual moment of impact, place him

well below ordinary standards of care at railway crossings. Plaintiff is the only witness that takes the stand who was at or near the crossing and who failed to notice some one or more of the warnings of the approach of this train. He does not state that he looked for them nor listened for them. While it may be true that he was crossing this particular railway crossing for the first time, he certainly is charged with knowledge of the fact that a railway crossing is a place of danger and that the traveler's care in passing over must measure up to the risk involved. We cannot help but believe that certain frank statements made by the plaintiff himself from the witness stand bear out the conclusion that his conduct fell far short of the care required for his own safety and the care that would, without doubt, have avoided his injury. After admitting that he saw the railway crossing sign some distance away, and as they approached the crossing, he states that he was "looking around—looking just as I went on, casually. I wasn't looking for anything." At another point: "I make the same—yes, I had no idea of no train, because I saw no lights—nothing to indicate. I just saw the sign and was going on leisurely." At still another point: "And of course I was a stranger. I assumed he knew all about what was going on with perfect ease. That is the way I was in the car with him." Under all of the circumstances of the case, we cannot escape the conclusion that all reasonable minds must unite upon the existence of contributory negligence on the part of the plaintiff.

There remains the question of the failure of the railway company to cause the word "stop" to be painted on the street in letters thirty inches high and to have a straight white line drawn under them at least four inches wide. It is true that the record shows that the railway company did not conform to this particular ordinance, but we are of the opinion that there is no causal connection shown in its failure to do so and the accident.

For the reasons given, the judgment of the circuit court of Kanawha County will be reversed, as will the

judgment of the Court of Common Pleas of Kanawha County, the verdict set aside and a new trial awarded.

*Judgment reversed; verdict set aside; new trial awarded.*